654 A.2d 939

James Lousean GOLDRING

v.

STATE of Maryland.

No. 877, Sept. Term, 1994.

Court of Special Appeals of Maryland.

March 3, 1995.

[redacted]

Ralph Larry Warren, Capitol Heights, for appellant.

Diane E. Keller, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Baltimore, and Walter B. Dorsey, State's Atty. for St. Mary's County of Leonardtown, on the brief), for appellee.

Submitted before MOYLAN, DAVIS and SALMON, JJ.

SALMON, Judge.

This case arises from a drag race during which two bystanders and one of the participants were killed. The surviving

participant, appellant James L. Goldring, was charged with three counts of involuntary manslaughter by motor vehicle under Md.Code (1957, 1992 Repl.Vol.), Art. 27, § 388. He was convicted by a jury in the Circuit Court for St. Mary's County (Kaminetz, J., presiding) on all three counts. The court sentenced appellant to a total of sixteen and one-half years imprisonment.[1]

I.   Whether there was sufficient evidence to support appellant's convictions for the deaths of the two bystanders.

II.  Whether a participant in a drag race can be held criminally responsible for the death of his co-participant.

## FACTS

According to the testimony adduced at trial, appellant and Robert K. Hall spent much of the day on April 25, 1993 drag racing their cars against various competitors at the Maryland International Raceway (MIR) in St. Mary's County. Appellant and Hall had planned to race against each other at MIR, but it closed before they had the opportunity to do so. Consequently, appellant and Hall agreed to race on the street.

In preparation for the race, a distance of a quarter mile was marked off on Sunny Side Road, a two lane macadam country road that measures 20 feet in width and is bordered by wheat fields. A flag man was appointed, and between 50 and 75 persons gathered to watch the race. The State's accident reconstructionist explained the tragic details of what occurred:

---

1. On Count III, appellant was sentenced to ten years imprisonment. Defendant was sentenced on Count II to ten years, suspend all but five years, consecutive with the sentence imposed in Count III. Counts II and III charged appellant with the death of two bystanders. Count III charged appellant with the death of his co-participant in the drag race, and on this count appellant was sentenced to five years, suspend all but eighteen months; sentence as to Count I to run concurrent with sentences imposed in Counts II and III. Although a portion of the sentence was suspended, the trial judge imposed no probation. Therefore, the effective sentence was 16 years and six months. *State v. Wooten*, 27 Md.App. 434, 442, 340 A.2d 308 (1975), *aff'd*, 277 Md. 114, 352 A.2d 829 (1976).

A prearranged race was made between Mr. Goldring and Mr. Hall. They all ended up at Pincushion Road and Sunny Side Road at the speed limit sign. That area is posted 45 miles per hour. From there a flagman gave them the go and they proceeded, Mr. Goldring in which would be the right lane and Mr. Hall in the left lane or the wrong side of the road. They proceeded on toward Route Five, at which—at one point Mr. Hall come [sic] across the lane markings and struck the side of Mr. Goldring's vehicle. Mr. Goldring continued to proceed towards Route Five. Mr. Hall, not having control of his vehicle, went into his critical curve, scuffing, went into the ditch on the side, hit the embankment, went airborne in a counter clockwise fashion. While he was rolling counter clockwise he had—he struck the parked Chevrolet pickup truck, the pickup truck spun clockwise and out into the road, Sunny Side Road. The [Hall] vehicle hit the dirt road, still spinning counter clockwise with a lot of force, struck the Blazer as it was coming back off the ground, with the left front bumper which caused the Blazer to flip over and come to final rest on its top. The [Hall] vehicle came to a final rest on its top and during the course of these collisions several pedestrians were struck.

Hall was killed instantaneously. Thirteen year old spectator James Young, Jr. died when the Blazer, which had been hit by Hall's car, rolled onto Young and crushed his head. Antonio Carter, a passenger on a motorcycle that had been waved off the road prior to the start of the race, was also killed when a vehicle rolled onto him.

## I.

Art. 27, § 388 provides that "[E]very person causing the death of another as the result of the driving, operation or control of an automobile . . . in a grossly negligent manner," shall be guilty of a misdemeanor to be known as "manslaughter by automobile . . ." We recently held that any driver participating in a drag race may be convicted under Art. 27, § 388 for the death of a third party, "regardless of which

driver actually collided with the victim or the victim's vehicle...." *Pineta v. State*, 98 Md.App. 614, 625, 634 A.2d 982 (1993).

In *Pineta*, the defendant and one Jaime Chicas engaged in a "drag race" on northbound Georgia Avenue, in Montgomery County. *Id.* at 619, 634 A.2d 982. During the race, the vehicle operated by Chicas struck a third vehicle as it was making a left turn from southbound Georgia Avenue into a restaurant driveway. *Id.* Both occupants in the third vehicle were killed. *Id.* In concluding that the evidence was sufficient to support the defendant's convictions for vehicular manslaughter, we stated that

> the jury could have rationally found that appellant agreed to engage in a "drag race" with Chicas at speeds of at least 70 miles per hour on Georgia Avenue and that the victims' deaths were the direct consequence of gross negligence on the part of both appellant and Chicas. By engaging in the illegal speed contest, appellant aided and abetted the criminal conduct of Chicas and appellant's actions were the proximate cause of the victims' deaths.

*Id.* at 626, 634 A.2d 982.

Drawing factual distinctions between *Pineta* and the case at hand, appellant submits that there was insufficient evidence of gross negligence in the instant case to support his convictions for the deaths of the two spectators. In his brief, appellant points out that both cars had undergone a safety check at MIR, that the race occurred on a pre-measured stretch of country road, and that there were "members of the community attending the race, who, like the racers, did not think that their participation demonstrated a wanton and reckless disregard of their own lives."

We are mindful that, in deciding the sufficiency of the evidence issue, we must review the evidence in the light most favorable to the State and determine whether any rational jury could have found the essential elements of the crime beyond a reasonable doubt. *Pendergast v. State*, 99 Md.App. 141, 148, 636 A.2d 18 (1994) (citing *Jackson v. Virginia*, 443

U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979)). Thus, in this case, we must determine whether there was sufficient evidence "beyond a reasonable doubt to establish that the defendant was grossly negligent, that is, that he had a wanton or reckless disregard for human life in the operation of an automobile." *State v. Kramer*, 318 Md. 576, 590, 569 A.2d 674 (1990).

The evidence presented at trial shows that appellant and Hall reached speeds of over 100 miles per hour while illegally drag racing on a country road that had a posted speed limit of 45 miles per hour. The portion of the two-lane road on which the race took place had no shoulder, was bordered by ditches on both sides, and contained a curve just a few hundred feet from the start. Further testimony established that both of the racing vehicles had been altered to accommodate the goal of maximum speed. The following testimony was offered regarding appellant's vehicle:

> The floor boards were actually rusted with holes exposed through the floorboards. There was no passenger's seat, no rear seat. The speedometer was inoperative, the cable had been disconnected. There was racing slicks on the rear, the front tires were regular tires like you would put out on a normal car, smaller, and they appeared to have some signs of dry rotting around the outside edges of them. Most of the lighting equipment was inoperative on the vehicle. Basically it had been stripped down, made as light as it could to go as fast as it could for racing.

Deputy William Cease testified that appellant's vehicle was not registered in Maryland, Virginia, or the District of Columbia, and that, due to its condition, could not be legally registered to be driven on public roadways.

The testimony concerning the significant safety precautions taken during the drag races held at MIR served to highlight further the extreme danger involved in drag racing on a public road. Royce Miller, the racing promoter at MIR, testified that the track surface at MIR is coated with "adhesive enhancing sprays" that help to prevent the cars from spinning and

losing control. In addition, the spectators at MIR sit behind a spectator fence that "is protected by a concrete barrier down both sides of the racetrack."

We hold that there was ample evidence to support a rational finding that appellant's decision to compete in a drag race on Sunny Side Road constituted grossly negligent conduct. In addition, we find no merit to appellant's argument that there was insufficient evidence to show that appellant caused or "aided and abetted" the involuntary manslaughter of the two spectators. Although we acknowledge that it was Hall's vehicle that went out of control, we have emphasized that it was appellant's conduct in competing in the race that constituted gross negligence. As in *Pineta*, it is clear that the jury could have rationally concluded that the deaths of the spectators were caused by the joint gross negligence of Hall and appellant in agreeing to engage in the race.

## II.

The question of whether a participant in a drag race can be held criminally liable under Art. 27, § 388 for the death of his co-participant[2] is one of first impression in Maryland. Appellant, citing cases from other jurisdictions, that hold that the requisite causation element is lacking, submits that our holding in *Pineta* should not be extended to the situation in which a co-participant is killed.

We recognize that, in similar factual situations, courts in other jurisdictions have held that the decedent participant's own grossly negligent conduct breaches the line of causation

---

2. Appellee argues that this issue has not been preserved for our review. Although it is undisputed that defense counsel addressed the issue of causation as to all three counts in his motion for judgment of acquittal, appellee argues that appellant's failure to distinguish the counts relating to the deaths of the spectators from the count relating to the death of Hall renders this issue unpreserved. We conclude that inasmuch as appellant specifically focused on the causation element, and is now arguing that issue on appeal, the sufficiency of the evidence issue was preserved for our review. *See Shand and Bailey v. State,* 103 Md.App. 465, 487–488, 653 A.2d 1000 (1995).

necessary to hold the surviving participant criminally liable. In *Commonwealth v. Root,* 403 Pa. 571, 170 A.2d 310 (1961), the Supreme Court of Pennsylvania held that "the defendant's conduct was not a sufficiently direct cause of the competing driver's death to make him criminally responsible therefor." *Id.,* 170 A.2d at 314. The Court noted that it was the reckless conduct of the deceased driver in suddenly swerving into oncoming traffic that brought about the deceased's head-on collision with the other vehicle. *Id.* Emphasizing that it would not apply tort concepts of proximate cause to criminal homicide cases, the Pennsylvania Court concluded that the link between the defendant driver's conduct and his competitor's death was too tenuous to charge the surviving participant with involuntary manslaughter:

> To persist in applying the tort liability concept of proximate cause to prosecutions for criminal homicide after the marked expansion of civil liability of defendants in tort actions for negligence would be to extend possible criminal liability to persons chargeable with unlawful or reckless conduct in circumstances not generally considered to present the likelihood of resultant death.

*Id.,* 170 A.2d at 311.

Other courts have followed the *Root* analysis. In *State v. Petersen,* 270 Or. 166, 526 P.2d 1008 (1974), the Oregon intermediate appellate court had affirmed the drag race participant's conviction for manslaughter in the death of the passenger who was riding in the co-participant's vehicle. Adopting the dissent from the intermediate appellate court opinion, the Supreme Court of Oregon reversed, emphasizing that criminal liability "should not be interpreted to extend to those cases in which the victim is a knowing and voluntary participant in the course of reckless conduct." *Id.,* 526 P.2d at 1009. Likewise, Florida has also followed this approach:

> [A] driver participant in an illegal "drag race" on a public road cannot be held criminally responsible for the death of another participant when (a) the deceased, in effect, kills himself by his own reckless driving during the race, and (b) the sole basis for attaching criminal liability for his death is

the defendant's participation in the drag race. [footnote omitted]

*Velazquez v. State,* 561 So.2d 347, 351 (Fla.Dist. 3 Ct.App. 1990), *review denied,* 570 So.2d 1306 (Fla.1990).[3]

In *State v. McFadden,* 320 N.W.2d 608 (Iowa 1982), the Supreme Court of Iowa rejected the above approach, thus affirming the race participant's conviction for manslaughter in the death of his competitor.[4] In that case, McFadden's competitor lost control of his vehicle during the course of a drag race on a city street in Des Moines, Iowa. The vehicle swerved into oncoming traffic and struck another vehicle, killing the passenger in that vehicle as well as McFadden's competitor.

The *McFadden* Court refused to apply the "direct causal connection" analysis emphasized in *Root,* and noted that there was no conceivable policy reason that justified "a different standard of proximate causation under our involuntary manslaughter statute than under our tort law." *Id.,* 320 N.W.2d at 613. The Court reasoned that "the foreseeability requirement, coupled with the requirement of recklessness . . . will prevent the possibility of harsh or unjust results in involuntary manslaughter cases." *Id.*

We note that, like the Pennsylvania Court in *Root,* the Court of Appeals of Maryland has recognized, in the context of

---

3.  Other cases holding that the defendant cannot be held criminally liable for the death of his racing competitor include *State v. Uhler,* 61 Ohio Misc. 37, 15 O.O.3d 457, 402 N.E.2d 556 (1979) (holding that the better view is "to not impose criminal liability . . . on the survivor of a drag race whose only contribution to the death of the other participant was his own participation in the race"), and *Thacker v. State,* 103 Ga.App. 36, 117 S.E.2d 913 (1961) (dismissing indictment of surviving racer because it failed to allege any act on the part of the defendant, save his own participation in the race, that contributed to the loss or control of the vehicle driven by the deceased).

4.  Other states have held similarly. *State v. Escobar,* 30 Wash.App. 131, 633 P.2d 100, 104 (1981) (applying Washington's negligent homicide statute, requiring "proximate" causation between reckless driving and the death of "any" person); *State v. Melcher,* 15 Ariz.App. 157, 487 P.2d 3 (1971).

the felony-murder doctrine, that tort liability concepts of proximate cause are not applicable in criminal proceedings. *Campbell v. State,* 293 Md. 438, 451, 444 A.2d 1034 (1982); *see also Sheppard v. State,* 312 Md. 118, 123 n. 3, 538 A.2d 773 (1988). In *Campbell,* the Court of Appeals held that where a fleeing co-felon is killed by either a police officer or a victim, the surviving felon is not guilty of felony murder. *Id.* at 452, 444 A.2d 1034. The Court reasoned that extending the felony murder to situations where co-felons are killed by non-felons would not achieve the rule's basic purpose:

> Manifestly, the purpose of deterring felons from killing by holding them strictly responsible for killings they or their co-felons commit is not effectuated by punishing them for killings committed by persons not acting in furtherance of the felony.

*Id.* at 450, 444 A.2d 1034, *accord Poole v. State,* 295 Md. 167, 174, 453 A.2d 1218 (1983).

Although the Court in *Campbell* stated its general disapproval of the application of tort concepts of proximate cause to criminal cases, it recognized that proximate cause principles had been "appropriately used to extend the application of the felony-murder doctrine in the so called 'shield' cases." 293 Md. at 451 n. 3, 444 A.2d 1034 (citing *Jackson v. State,* 286 Md. 430, 408 A.2d 711 (1980)). The *Campbell* Court emphasized that where a felon uses a victim as a shield, or compels a victim to occupy a place or position of danger, the felon has committed a direct lethal act against the victim. *Id.* Thus, it is this act that creates a "sufficiently close and direct causal connection to impose criminal liability on a felon when the victim is killed by a non-felon." *Id.*

In the context of an involuntary manslaughter case, the Court of Appeals has said the following:

> It is not essential to the existence of a causal relationship that the ultimate harm which has resulted was foreseen or intended by the actor. It is sufficient that the ultimate harm is one which a reasonable man would foresee as being reasonably related to the acts of the defendant * * * To

constitute the cause of the harm, it is not necessary that the defendant's act be the sole reason for the realization of the harm which has been sustained by the victim. The defendant does not cease to be responsible for his otherwise criminal conduct because there were other conditions that contributed to the same result.

*Palmer v. State,* 223 Md. 341, 353, 164 A.2d 467 (1960) (quoting 1 Wharton, Criminal Law and Procedure (Anderson, § 68)); *see also Mills v. State,* 13 Md.App. 196, 200, 282 A.2d 147 (1971) (recognizing that "a causal connection between gross negligence and death must exist to support a conviction, although it is not essential that the ultimate harm which resulted was foreseen or intended").

Applying the above principles to the facts in the case at hand, we hold that appellant's conduct in competing in the drag race bore a sufficiently direct causal connection to Hall's death to support appellant's conviction for involuntary manslaughter under Art. 27, § 388. We are not willing to hold that appellant's conduct was causally related to the deaths of the spectator victims but was not causally related to that of Hall.

In *Minor v. State,* 326 Md. 436, 605 A.2d 138 (1992), defendant was convicted of reckless endangerment after he handed his brother a loaded shotgun, and his brother fatally shot himself. The Court of Appeals upheld defendant's conviction for reckless endangerment. *Id.* at 444, 605 A.2d 138. We note that, in the case *sub judice,* the causation element is different because with the crime of reckless endangerment, "[i]t is the reckless conduct and not the harm caused by the conduct, if any, which the statute was intended to criminalize." *Id.* at 442, 605 A.2d 138. Nonetheless, to the extent that *Minor* stands for the proposition that the decedent's own reckless conduct does not relieve the participating defendant of criminal responsibility for his reckless conduct, it has influenced our holding in this case.

On those same lines, in *Commonwealth v. Atencio,* 345 Mass. 627, 189 N.E.2d 223 (1963), the Supreme Judicial Court

of Massachusetts upheld the defendant's conviction for manslaughter arising out of his participation in Russian Roulette game. We find the following reasoning from the Court's opinion to be persuasive:

> It is an oversimplification to contend that each participated in something that only one could do at a time. There could be found to be a mutual encouragement in a joint enterprise. In the abstract, there may have been no duty on the defendants to prevent the deceased from playing. But there was a duty on their part not to cooperate or join him in the "game."

*Id.*, 189 N.E.2d at 225.

Although we have acknowledged that it was Hall that lost control of his vehicle and ultimately contributed to his own death, the extremely dangerous conditions under which this race was undertaken cannot be overstated. As we stressed in Part I of this opinion, both vehicles had been significantly altered for drag racing on licensed race tracks and were thus ill-equipped to operate safely on a country road at speeds of over 100 miles per hour. Moreover, the racing promoter testified that, in order to preserve safety, one racing lane at MIR is wider than a typical two-lane highway. The accident reconstructionist noted that the lane in which Hall was driving measured only nine feet, seven inches in width, and appellant's lane, ten feet, seven inches wide. In short, we conclude that it was these treacherous conditions, under which both Hall and appellant agreed to race, that foreordained the fatal results that followed.

**JUDGMENTS AFFIRMED; COSTS TO BE PAID BY APPELLANT.**